UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────────

KENNETH GASTON,

                       Plaintiff,

        v.

THOMAS A. COUGHLIN, III, DONALD SELSKY,
LT. GRANT, LT. LeBARON, HANS WALKER,
FRANK IRVIN, EDWARD DANN, and JOHN
DOE (Confidential Informant),

                    Defendants.

───────────────────────────────────

**DECISION
and
ORDER**

**98-CV-6016F
(consent)**

APPEARANCES:       KENNETH GASTON, *Pro Se*
                           Collins Correctional Facility
                           P.O. Box 340
                           Collins, New York 14034

                           SCHULTE ROTH & ZABEL, LLP
                           Attorneys for Plaintiff
                           F. BARBARA GLUCK REID, of Counsel
                           919 Third Avenue
                           New York, New York 10022

                           ELIOT L. SPITZER
                           New York Attorney General
                           Attorney for Defendants
                           MICHAEL J. RUSSO
                           Assistant Attorney General
                           107 Delaware Avenue
                           Fourth Floor
                           Buffalo, New York 14202

## <u>JURISDICTION</u>

      The parties to this action consented to proceed before the undersigned on

November 13, 2002.  The matter is presently before the court on Defendants' motion

for summary judgment (Doc. No. 143), filed November 8, 2002.

## BACKGROUND

Petitioner commenced this action on August 27, 1991, seeking relief pursuant to 42 U.S.C. § 1983, alleging deprivation of due process in connection with a prison disciplinary proceeding at Auburn Correctional Facility ("Auburn") and Eighth Amendment violations based on prison conditions in the Special Housing Unit ("SHU") at Attica Correctional Facility ("Attica") where Petitioner, after being found guilty in the challenged disciplinary proceedings, was confined for one year.  The original Defendants to this action included New York State Department of Correctional Services ("DOCS") Commissioner Thomas A. Coughlin, III ("Coughlin"), SHU Program Director Donald Selsky ("Selsky"), and Attica Correctional Hearing Officers Lt. Grant ("Grant"), and LeBaron ("LeBaron"), who filed  answers to the Complaint on October 22, 1991. On December 19, 1991, the parties consented to proceed before the undersigned for all purposes, including the entry of judgment, and that any appeal from the undersigned's ruling would be taken to the District Judge, as was then authorized under 28 U.S.C. § 636(c)(4).

On January 22, 1992, Plaintiff filed an Amended Complaint (Doc. No. 21) ("Amended Complaint"), with leave of the court, adding as Defendants Auburn Superintendent Hans Walker ("Walker"), former Auburn First Deputy Superintendent Frank Irvin ("Irvin"), and Auburn Deputy Superintendent for Security Edward Dann ("Dann").  Answers to the Amended Complaint were filed on February 12, 1992 by Defendants Coughlin, Selsky, Grant and LeBaron, and on March 4, 1004 by Defendants Walker, Irvin and Dann.  On September 14, 1992, Defendants Coughlin, Selsky, Grant and LeBaron filed amended answers to the Amended Complaint.

On November 16, 1992, following the conclusion of discovery, Plaintiff filed a motion for partial summary judgment as to the liability of Defendants Selsky, LeBaron and Grant.  On March 8, 1993, Defendants filed a motion for summary judgment to dismiss the Amended Complaint as to all Defendants as a matter of law.  On August 12, 1994, the undersigned denied Plaintiff's motion for partial summary judgment and granted summary judgment in favor of Defendants.  August 12, 1994 Order (Doc. No. 115).  Judgment in favor of Defendants was entered on August 17, 1994 and the file was closed.  On August 30, 1994, Plaintiff erroneously filed an appeal with the Second Circuit Court of Appeals which, on February 21, 1995, remanded the matter to District Judge Larimer who, at that time, had jurisdiction pursuant to 28 U.S.C. § 636(c)(4). The file was reopened on April 5, 1995 and, in a Decision and Order filed on October 5, 1998 (Doc. No. 126), Judge Larimer affirmed the August 12, 1994 Order, and the file was closed on October 19, 1998.

On October 30, 1998, Plaintiff filed an appeal with the Second Circuit which, on May 7, 2001, affirmed the District Court on all grounds, with the exception of the Second Cause of Action asserting Eighth Amendment prison conditions claims against Defendants Grant and LeBaron, which were remanded for further proceedings. *Gaston v. Coughlin*, 249 F.3d 156, 166-67 (2d Cir. 2001).  The file was accordingly reopened on June 15, 2001.

On November 8, 2002, Defendants filed a motion for summary judgment directed at Plaintiff's Eighth Amendment claim (Doc. No. 143).  Filed on November 8, 2002 in support of the motion were "Defendants' Memorandum of Law in Support of Motion for Summary Judgment" (Doc. No. 144) ("Defendants' Memorandum"), the Declarations of

Assistant Attorney General Michael Russo ("Russo") (Doc. No. 145) ("Russo

Declaration"); Grant (Doc. No. 146) ("Grant Declaration"), LeBaron (Doc. No. 148)

("LeBaron Declaration"), and Marco Hume ("Hume") (Doc. No. 149) ("Hume

Declaration"), and "Defendants' Statement of Undisputed Material Facts" (Doc. No.

147) ("Defendants' Undisputed Facts Statement).  Plaintiff, in opposition to summary

judgment, filed on February 23, 2002, the Affidavit of Kenneth Gaston (Doc. No. 152)

("Gaston Affidavit"), a "Rule 56 Counterstatement of Facts" (Doc. No. 153) ("Plaintiff's

Disputed Facts Statement"), "Plaintiff's Memorandum of Law in Opposition to

Defendants' Motion for Summary Judgment" (Doc. No. 154) ("Plaintiff's Memorandum"),

and the Declaration of Tim O'Neal Lorah, Esq.[1] (Doc. No. 155) ("Lorah Declaration").

On January 24, 2003, Defendants filed in further support of the summary judgment

motion "Defendants' Reply Memorandum of Law in Support of Motion for Summary

Judgment" (Doc. No. 157) ("Defendants' Reply"), the Reply Declaration of LeRoy Grant

(Doc. No. 158) ("Grant Reply Declaration"), and the Reply Declaration of Donald

LeBaron (Doc. No. 159) ("LeBaron Reply Declaration").  Oral argument was deemed

unnecessary.

　　　　Based on the following, Defendants' motion for summary judgment is

GRANTED.

**FACTS**[2]

---

[1] Plaintiff was represented in this action by Mr. Lorah, formerly an associate at Schulte Roth & Zabel, LLP, until February 11, 2003, when Mr. Lorah left the firm.  On May 18, 2005, F. Barbara Gluck Reid, Esq., who is an associate with Schulte Roth & Zabel, LLP, became Plaintiff's attorney.

[2] Taken from the pleadings and motion papers filed in this action.

In May 1990, Plaintiff Kenneth Gaston ("Gaston"), while incarcerated at Auburn Correctional Facility ("Auburn"), served as vice president of Auburn's Inmate Liaison Committee ("ILC").  On May 19, 1990, a group of inmates staged a food strike at Auburn.  Auburn First Deputy Superintendent Frank Irvin ("Irvin"), and Deputy Superintendent for Security Edward Dann ("Dann") met with ILC members, including Gaston, regarding the incident and Gaston stated that he was in his cell during the food strike and did not participate in the food strike.  A confidential informant later reported to Dann that Gaston had organized the food strike and Dann, based on that information, on May 21, 1990, prepared a misbehavior report charging Gaston with violating DOCS Rule 104.12, prohibiting inmates from participating in activities which threaten a prison facility's order.  As a result of the disciplinary charges, Gaston, on May 21, 1990, was transferred to Attica where he was placed in cell 23 on the second floor of the B-West Gallery in Attica's SHU, located in Attica's Reception Building.  Following a disciplinary hearing at Attica, Gaston, on August 31, 1990, was found guilty as charged and was sentenced to confinement in SHU for two years.[3]  Gaston filed an administrative appeal and, on November 2, 1990, the guilty disposition was affirmed, but his term of SHU confinement was reduced to one year.

Gaston maintains that the conditions of his confinement in SHU at Attica were inhumane and violated his Eighth Amendment right to be free from cruel and unusual

---

[3] A disciplinary hearing on the misbehavior report was originally conducted on May 25 and 31, 1990, following which Attica Disciplinary Hearing Officer LeBaron found Gaston guilty as charged. Gaston, however, filed an administrative appeal challenging the finding on the basis that Officer LeBaron had failed to conduct an independent assessment as to the confidential informant's reliability and the decision was reversed.  Gaston, on August 20, 1990, was again served with the misbehavior report and a second hearing was conducted on August 24 and 31, 1990, before Attica DOCS Lieutenant Grant who, on August 31, 1990, found Gaston guilty of the charged prison rule infraction.

punishment.  In particular, Gaston alleges that numerous broken windows in his

cellblock were not repaired for the entire winter season of 1990-1991, when the outside

temperatures were "freezing and sub-zero," that he was subjected for a prolonged

period of time to freezing temperatures requiring Gaston to wear all of the clothing

issued to him at all times, including while he slept, that mice were continually entering

his cell and that for several days during July 1990, the area in front of his cell was filled

with human feces, urine and sewage water.  Amended Complaint ¶¶ 63-72.  Gaston

claims that he filed a grievance regarding the broken windows, to no avail, and that his

complaints to DOCS sergeants assigned to his cellblock about the unsanitary

conditions were ignored.  Amended Complaint ¶¶ 67, 70.


## DISCUSSION

### 1.      Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a

moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a) and (b);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The

court is required to construe the evidence in the light most favorable to the non-moving

party.  *Tenenbaum v. Williams*, 193 F.3d 58, 593 (2d Cir. 1999) (citing *Anderson, supra*,

at 255).  The party moving for summary judgment bears the burden of establishing the

nonexistence of any genuine issue of material fact and if there is any evidence in the

record based upon any source from which a reasonable inference in the non-moving

party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex, supra*, at 322; *see Anderson, supra*, at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  In assessing a record to determine whether there is genuine issue of material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.  *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra*, at 323-24 (1986) (quoting Fed.R.Civ.P. 56).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v.*

7

*March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

Although a summary judgment motion may be made with or without supporting affidavits, if affidavits are submitted, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

"However, if the motion for summary judgment is not made and supported as provided in Rule 56, the Rule does not impose on the party opposing summary judgment an obligation to come forward with affidavits or other admissible evidence of his own."  *St. Pierre v. Dyer*, 208 F.3d 304, 404 (2d Cir. 2000) (reversing granting of summary judgment in favor of defendant because defendant failed to allege factual basis for assertions contained in defendant's affidavit such that plaintiff, as the party opposing summary judgment, was not required to adduce evidence to defeat summary judgment and the "self-serving" nature of plaintiff's affidavit statements went to the weight of the statements, rather than to their admissibility).

As discussed, Background, *supra*, at 3, this case was remanded from the Second Circuit for further proceedings only with regard to the Second Cause of Action alleging Defendants Grant and LeBaron violated Gaston's Eighth Amendment right prohibiting cruel and unusual punishment.  Most of Gaston's allegations concerning

Defendants Grant and LeBaron pertain to their participation in Gaston's Tier III disciplinary hearings conducted with regard to the prison disciplinary charges brought against Gaston following the food strike at Auburn.  Gaston specifically alleged that Grant and LeBaron violated Gaston's due process rights during the disciplinary hearings by relying on the confidential informant's hearsay statements without independently assessing the informant's credibility.  Amended Complaint ¶¶ 31-36, 42-47, 54-59.  Summary judgment on the due process claims, however, was granted in favor of all Defendants, including Grant and LeBaron.  *Gaston*, *supra*, at 163-64.  Gaston's sole Eighth Amendment claim against Defendants Grant and LeBaron therefore is that as a result of Grant's and LeBaron's dispositions concerning the disciplinary proceedings, Gaston was forced to endure treatment and unsanitary conditions while  confined to SHU in Attica in violation of the Eighth Amendment's prohibition of cruel and unusual punishment.  Amended Complaint, Second Cause of Action ¶ 85 (referencing Amended Complaint ¶¶ 63-77).

With regard to Gaston's Eighth Amendment claim, the only factual allegation pleaded in the Amended Complaint against Grant and LeBaron states in its entirety: "[t]hroughout the time that plaintiff was confined to SHU pursuant to the dispositions of defendants LeBaron and Grant, he was subjected to intense mental anguish and excruciating emotional and psychological pain caused by conditions existing in SHU at that time."[4]  Amended Complaint ¶ 64.  Despite the dearth of factual allegations

---

[4] The court notes that Gaston's allegations regarding mental anguish and excruciating emotional and psychological pain were made prior to the enactment of the Prison Litigation Reform Act of 1995 ("the PLRA"), 110 Stat. 1321 (1996), codified at 42 U.S.C. § 1997e, which prohibits a prisoner from recovering for mental or emotional injury without a prior showing of physical injury.  42 U.S.C. § 1997e(e)).  The PLRA's requirement of a physical injury to establish a mental or emotional injury, however, has been held

connecting Grant and LeBaron to the alleged substandard conditions in SHU, the

Second Circuit remanded the matter for further proceedings, citing Gaston's assertion

in his memorandum of law opposing Defendant's earlier summary judgment motion,

that Grant and LeBaron had "'actual knowledge of the events that occurred in Attica's

SHU because they made daily rounds and were directly responsible for placing plaintiff

in [the] inhumane conditions,'" and neither Grant nor LeBaron had submitted an

affidavit or other sworn evidence denying knowledge of, responsibility for, or

involvement in the alleged inhumane conditions in Attica's SHU.[5]  *Gaston*, *supra*, at

165-66 (quoting Gaston Memorandum of Law dated April 16, 1993 (Doc. No. 110), at

26).

Defendants move for summary judgment seeking to dismiss the Eighth

Amendment claims on the basis that Gaston has failed to allege, or to submit

admissible evidence, that either Grant or LeBaron was personally involved in any of the

conditions which allegedly violated Gaston's Eighth Amendment rights, Defendants'

Memorandum at 2, and, alternatively, that none of Grant's or LeBaron's actions violated

Gaston's rights under the Eighth Amendment, Defendants' Memorandum at 10.

---

not to be retroactively applied.  *See Giano v. Kelly*, 2000 WL 876855, * 25 (S.D.N.Y. May 16, 2000) (citing cases where district courts within the Second Circuit and other circuit Courts of Appeal have held § 1997e(e) is not retroactive); *see also Harris v. Lord*, 957 F.Supp. 471, 474 (S.D.N.Y. 1997) (holding § 1997e(e)'s physical injury requirement is not retroactively applicable to case filed prior to PLRA's effective date).

[5] Most of the "inhumane conditions" to which Gaston alleged he was subjected while housed in Attica's SHU did not exist when LeBaron and Grant rendered their Tier III disciplinary hearing dispositions, respectively on May 31, 1990 and August 31, 1990, regarding the disciplinary infractions charged against Gaston as a result of the food strike at Auburn.  In particular, Gaston alleges that windows on the B-West Gallery remained broken and the temperature was set too low during the winter of 1990-1991, fails to specify when his SHU cell was invaded by mice, and the July 1990 dates on which Gaston alleges the area in front of his SHU cell was filled with sewage, urine and feces occurred subsequent to the May 31, 1990 hearing disposition rendered by LeBaron.

Gaston argues in opposition to summary judgment that triable issues of fact preclude granting Defendants' summary judgment motion.  Plaintiff's Memorandum at 2. Specifically, Gaston points to factual issues pertaining to the broken windows and low temperature in his cell, Plaintiff's Memorandum at 4-17, and the unsanitary condition outside his cell while confined to SHU, Plaintiff's Memorandum at 17-25.  Defendants argue in further support of summary judgment that Gaston has failed to point to any evidence substantiating his Eighth Amendment claim and, as such, has failed to meet his burden to defeat summary judgment.  Defendants' Reply at 1-13.

## 2.    Eighth Amendment and Personal Involvement

Gaston alleges his Eighth Amendment right to be free from cruel and unusual punishment was violated by Defendants Grant and LeBaron whose Tier III disciplinary rulings caused Gaston to be confined in Attica's SHU where the conditions were substandard insofar as a large number of mice continually entered Gaston's cell, the area directly in front of the cell was filled with human feces, urine and sewage water for several days during July 1990, and the B-West Gallery was inadequately heated during the winter season of 1990-1991, compelling Gaston and other inmates confined to the B-West Gallery had to wear all their issued clothing at all times.  Amended Complaint, ¶¶ 63-72.  It is well settled that the Eighth Amendment prohibits "cruel and unusual" punishment suffered during imprisonment.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir.1993).  However, not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment protections.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Only the

11

unnecessary and wanton infliction of pain constitutes cruel and unusual punishment

forbidden by the Eighth Amendment.  *Id.*  To establish an Eighth Amendment violation

based on prison conditions, a plaintiff must demonstrate "that it is contrary to current

standards of decency for anyone to be exposed against his will" to the challenged

prison conditions.  *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

> An Eighth Amendment claim based on prison conditions must satisfy
>
> both an objective element - - that the prison official's transgression was
> 'sufficiently serious' - - and an objective element - - that the officials acted, or
> omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate
> indifference to inmate health or safety.'

*Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511
U.S. 825, 834 (1994)).

As to the objective element, while the Constitution "does not mandate comfortable

prisons," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981), prison inmates may not be

denied "the minimal civilized measure of life's necessities."  *Id*. at 347.  The Supreme

Court has held that the Eighth Amendment requires that inmates not be deprived of

their "basic human needs - - *e.g.*, food, clothing, shelter, medical care, and reasonable

safety."  *Helling*, *supra*, at 32 (internal citation and quotation omitted).  "Nor may prison

officials expose prisoners to conditions that 'pose an unreasonable risk of serious

damage to [their] future health.'" *Phelps*, *supra*, at 185 (quoting *Helling*, *supra*, at 35).

The Eighth Amendment's objective prong requires an inmate "prove that the conditions

of his confinement violate contemporary standards of decency."  *Id*.

> As to the subjective element, the Supreme Court has held that
>
> a prison official cannot be found liable under the Eighth Amendment for denying
> an inmate humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official must both be

12

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, *supra*, at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard, similar to, but not quite the equivalent of, subjective intent. *Id*. at 839-40.

To prevail on a § 1983 claim, the plaintiff must prove that the defendant caused the alleged deprivation of rights. *Taylor v. Brentwood Union Free School District*, 143 F.3d 697, 686 (2d Cir. 1998).  A further prerequisite for liability under a §1983 claim is personal involvement by a defendant in the alleged constitutional deprivation. *Sealey v. Giltner,* 116 F.3d 47, 51(2d Cir. 1997); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986).  The mere fact that a defendant holds a supervisory position over others accused of violating a plaintiff's constitutional rights is insufficient to impose §1983 liability absent proof of personal involvement, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), and the doctrine of *respondeat superior* does not apply.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing cases).

Because personal involvement is a question of fact, summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law.  *Williams*, *supra*, at 323 (citing Fed. R. Civ. P. 56(c) and cases).  The Second Circuit has acknowledged several ways in which a defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983, including  (1) direct participating in the alleged constitutional violation, (2) failing by a supervisory official to remedy the

wrong upon being informed of the violation, (3) creating a policy or custom permitting the alleged constitutional violation to occur, (4) being grossly negligent in supervising subordinates who committed the allegedly wrongful acts, or (5) exhibiting deliberate indifference to the rights of inmates by failing to act on information indicating that the unconstitutional acts were occurring.  *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (citing cases).

As stated, in the instant case, Gaston's alleges in the Amended Complaint that his confinement in Attica's SHU, where he maintains he was exposed to freezing and unsanitary conditions, directly resulted from the disposition of the disciplinary proceedings conducted by Defendants Grant and LeBaron based on the misbehavior report.  Amended Complaint ¶¶ 64, 85.  Gaston further alleges in opposition to summary judgment that both Defendants Grant and LeBaron supervised units within the Attica Reception Building and hospital, including the second floor B-West Gallery of the SHU where Gaston was confined, and made daily rounds while assigned there. Gaston Affidavit ¶¶ 6, 10.  Although such allegations may be sufficient to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), they are, without more, insufficient to defeat summary judgment based on an absence of Defendants' personal involvement.[6]

### A.    Rodent Infestation

Defendants argue with regard to Gaston's allegation that his SHU cell was

---

[6] As the court finds that Gaston fails to establish any issue of fact regarding the requisite personal involvement of either Defendant Grant or LeBaron in the alleged Eighth Amendment violations, the court does not reach the merits of Gaston's claims.

"continually invaded" by "a large number of mice," Amended Complaint ¶ 72, which

Defendants characterize as an "exaggeration," Defendants' Memorandum at 4, that

because Gaston never mentioned the alleged mice problem to any DOCS employee

and Defendants were unaware of any mice problem in Attica's Reception Building,

there can be no factual question that Defendants were not personally involved in the

alleged failure to remedy such problem, particularly as Gaston fails to adduce evidence

they were even aware of the alleged problem.  Defendants' Memorandum at 4.  In

support of their argument, Defendants submit affidavits made on personal knowledge,

setting forth facts that would be admissible into evidence, thereby affirmatively

demonstrating that Defendants are competent to testify to the matters stated therein.

*See St. Pierre*, *supra*, at 303 (citing Fed. R. Civ. P. 56(e)).  In particular, Defendants

reference Gaston's deposition testimony wherein Gaston admitted that he never

complained to any DOCS employee about any mice in his cell and never filed an

inmate grievance as to the mice.[7]  Grant Declaration ¶ 6 (referencing Plaintiff's

Deposition Testimony Transcript ("Plaintiff's Deposition T")[8] at 80-81); LeBaron

Declaration ¶ 6 (same); *see also* Defendants' Memorandum at 3-4 (same).  A plain

reading of Gaston's deposition testimony establishes that Gaston admitted that

although he saw mice in his SHU cell on more than three occasions, he was unable to

---

[7] Although Defendants do not assert failure to exhaust administrative grievances as a basis for summary judgment, the court notes that the PLRA's provision requiring prisoners exhaust administrative remedies prior to commencing a civil actions with respect to prison conditions, *Webb v. Goord*, 340 F.3d 105, 112 (2d Cir. 2003), was not in effect when Gaston commenced the instant action.  The Second Circuit, however, has held that the PLRA's administrative exhaustion requirement, 42 U.S.C. § 1997e(a), is not rectroactively applicable to cases filed prior to the PLRA's enactment.  *Salahuddin v. Mead*, 174 F.3d 271, 274 (2d Cir. 1999).

[8] Attached as Exhibit A to LeBaron Declaration.

recall whether he saw mice on more than five occasions.  Plaintiff's Deposition T. at 80.

Gaston further admitted he never filed any grievance or made any verbal complaint to

any DOCS employees regarding mice invading his SHU cell.  Plaintiff's Deposition T. at

80-81.  Grant maintains that he has worked at Attica since 1986, is unaware that there

has ever been a serious mice problem in Attica's Reception Building, where the SHU is

located and, further, has never seen a mouse in the Reception Building.  Grant

Declaration ¶¶ 6-7.  LeBaron states that he was unaware of any serious mice problem

anywhere within the Attica facility, where he worked from 1989 until 1992.  LeBaron

Declaration ¶ 6.

Defendants also submitted in support of summary judgment an affidavit from

Attica Maintenance Supervisor III and Acting Plant Superintendent Marco Hume

("Hume"), who has been a DOCS employee at Attica since 1981.  Hume Declaration ¶

1.  Hume states that in his position, he is "fully familiar with the practices and

procedures utilized by the Maintenance Department at Attica, which is responsible for

maintaining the physical aspects of the facility."  *Id*. ¶ 1.  According to Hume, Attica's

Maintenance Department has a pesticide program that is responsible for addressing

any rodent or insect problem within the facility, and there has never been a mice

problem at Attica since Hume began working there in 1981.  *Id*. ¶ 21.  Hume states that

when an "infrequent mice spotting[ ]" occurs, the Maintenance Department "will place

sticky boards on the floor, and such method has been proven effective to capture the

mouse."  *Id*.  Hume further explains that "[a]ny spotting of a mouse generates a work

order to the Maintenance Department.  I reviewed the maintenance records for the

entire Reception Building for the years 1990 and 1991, and there was not one work

order generated during that two year period regarding the spotting of a mouse or any other rodent." *Id*. ¶ 22.

Attached as Exhibit C to the Hume Declaration are copies of Attica's Maintenance Work Requests for the years 1990 and 1991, a thorough review of which corroborates Hume's statement that no work order regarding mice or rodents was ever issued during 1990 or 1991 for the second floor B-West Gallery where Gaston's SHU cell was located.  In fact, only two work orders pertaining to rodents were issued during the pertinent time, including on October 31, 1990, requesting "Mice Extermination. Property Room, Kitchen - East Gallery Hole in the Wall," and on  November 5, 1990, requesting "Repair East Gallery Hole in Floor.  Rodent Traffic."  Hume Declaration Exhibit C.  Accordingly, the affidavits Defendants submitted in support of summary judgment meet the criteria of Rule 56(e) such that Gaston, in opposing summary judgment, may not rest upon the Amended Complaint's allegations but, instead, "'must set forth specific facts showing that there is a genuine issue for trial.'" *St. Pierre*, *supra*, at 404 (quoting Fed. R. Civ. P. 56(e)).

Significantly, Gaston, in opposing summary judgment, has not denied that he neither notified any DOCS employee nor filed any inmate grievance regarding the alleged rodent infestation within his SHU cell.  Rather, Gaston reiterates that while he was housed in his cell located on the second floor of B-West Gallery of Attica's SHU, "mice invaded my cell *on numerous occasions*."  Gaston Affidavit ¶ 27 (italics added). This statement, on its face, constitutes a deviation from Gaston's original allegation that a "*large number* of mice [were] *continually invading* plaintiffs' [*sic*] cell."  Amended Complaint ¶ 72 (italics added).  Gaston further states that "[t]he mice would have been

17

in plain view for anyone on the unit to observe, including the defendants who were

present in the B-West Gallery of the SHU during this time."  Gaston Affidavit ¶ 28.

These statements, however, are devoid of any "specific facts" required to show a

genuine issue necessitating trial as to whether Defendant Grant or LeBaron caused

Gaston to have to endure such infestation or was personally involved in the alleged

rodent infestation in failing to take corrective action after becoming aware of the

problem.  *St. Pierre*, *supra*, at 404-05.  Nor has Gaston otherwise corroborated his

statements with any other evidence, such as an affidavit made by another inmate who

witnessed the alleged infestation.

Gaston argues that Hume's statement in his declaration that a review of "the

maintenance records for the entire Reception Building for the years 1990 and 1992,

and there was not one work order generated during that two year period regarding the

spotting of a mouse or any other rodent," is belied by the two "Maintenance Work

Requests" dated October 31, 1990, for "mice extermination," and November 5, 1990,

for "rodent traffic."  Plaintiff's Memorandum at 24.  However, a plain review of the

October 31, 1990 and November 5, 1990 Maintenance Work Requests demonstrates

that the rodent problems were limited to the East Gallery which, as LeBaron later

explains, Discussion, *supra*, at 26, is separated by a concrete wall from the West

Gallery where Gaston's SHU cell was located.  Nor is LeBaron's admission that he

occasionally saw a mouse at the facility, LeBaron Declaration ¶ 6, inconsistent with a

finding that nothing in the record establishes any issue of fact which, broadly construed

in Gaston's favor, would demonstrate any personal involvement by LeBaron in the

alleged rodent infestation in Gaston's SHU cell.  Further without any merit is Gaston's

18

argument that Grant's "bold" assertion that, despite having worked in various capacities throughout the Attica facility since 1986, Grant has "'no recollection of ever seeing a mouse in the Reception building,'" Plaintiff's Memorandum at 24 (quoting Grant Declaration ¶ 6), is inconsistent with LeBaron's statement that he occasionally saw a mouse and the October 31 and November 5, 1990 maintenance work request records for the Reception Building which show two repairs were made in response to mice and rodents.  Rather, given that there were only two such work requests during the relevant time period for the Reception Building, it is quite possible that Grant never saw a mouse in connection with either work request.  Further, Grant limited his statement to never having observed mice in the Reception Building, which does not foreclose the possibility that Grant may have seen a mouse or other rodent in some other part of Attica's facility during the relevant period of time.  In any event, even contemporary standards of civilized society must allow for an occasional mouse.

Accordingly, the record is devoid of any genuine issue of fact that could establish that Defendants were personally involved in causing, permitting to continue or failing to remedy the alleged rodent infestation problem in Gaston's SHU cell and summary judgment on this aspect of Defendants' motion for summary judgment is GRANTED.


**B.     Unsanitary Conditions**

Gaston also fails to establish an issue of fact as to any causation or personal involvement on the part of Grant or LeBaron in the alleged unsanitary conditions outside of Gaston's SHU cell.  Gaston alleges that "from July 7-9, 1990, the area directly in front of plaintiffs' [*sic*] cell was filled with human feces, urine and sewage

19

water."  Amended Complaint ¶ 65.  According to Gaston, sometime between July 7 and July 9, 1990, the inmate housed in the cell next to Gaston's cell attempted suicide to compel prison officials to remove him from the unsanitary conditions after the inmate's repeated requests to Sergeants Smith and Cunningham and other prison officers were ignored.  Amended Complaint ¶ 66.  Gaston maintains that his own requests that the unsanitary conditions be remedied were also ignored, Amended Complaint ¶ 67, and that on July 21, 1990, human feces were again thrown onto the company gallery. Amended Complaint ¶ 68.  Gaston later, in opposition to summary judgment, states that while he was housed in Cell 23 on the second floor of Attica's SHU, various inmates, "on a regular basis," would flood their toilets and often threw feces at each other during arguments.  Gaston Affidavit ¶ 20.  Gaston, in his opposition to summary judgment, however, changes the first set of dates for which he maintains that the area directly in front of his cell was filled with human waste and sewage from July 7 to July 9, 1990, to "[d]uring the time surrounding the holiday of July 4, 1990."  Gaston Affidavit ¶ 23. Gaston attributes the change in dates to the fact that he did not have a calendar in his SHU cell, nor did he have access to a calendar while housed in SHU.  *Id*. ¶ 24.[9] Gaston further maintains that the unsanitary conditions "would have been obvious to anyone stationed in or walking on the second floor B-West Gallery, including the defendants who were present in the B-West Gallery of the SHU during this time."  *Id*. ¶ 26.

In support of summary judgment based on lack of personal involvement,

---

[9] How Gaston's presumable subsequent access to a calendar after such a substantial lapse of time jogged his memory so precisely is not explained.

Defendants reference the Unit Activity Log Book ("Activity Log") and SHU Sign-In Log Book ("Sign-In Log") (together, "the log books"),[10] for the relevant dates as establishing that no unsanitary condition existed near Gaston's cell such that neither Grant nor LeBaron could be liable for failing to remedy any such situation.  Grant Declaration ¶¶ 8-16; LeBaron Declaration ¶¶ 9-15. LeBaron explains that the Activity Log is located in the control room on the second floor of the Reception Building, which is occupied by a corrections officer, and contains entries pertaining to the East, West and South Galleries of the SHU's second floor.  LeBaron Declaration ¶ 11.  Recorded in the Activity Log are all the inmates' daily activities, including yard activity, feeding, sick-call, rounds of all staff, and any unusual incidents.  *Id*.  The Sign-In Log is maintained at the entry to SHU and must be signed by every person entering SHU.  *Id*. ¶ 12.  Sign-In Log entries record as to each SHU visitor the time of entry and exit, printed name, signature, rank, and the reason for the visit.  *Id*.  LeBaron further explains that when the notation "rounds" appears in the Sign-In Log, it does not necessarily indicate that the corrections officer conducted rounds of the gallery but, rather, would indicate only that the corrections officer had visited the unit to ascertain whether any unusual incidents had occurred.  *Id*. n. 2.  Had the corrections officer actually made a gallery round, that fact would be noted in the Activity Log.  *Id*.  Neither the Activity Log nor the Sign-In Log contain any entry indicating that LeBaron was present on the second floor of the Reception Building on July 7, 8 or 9, 1990.  *Id*. ¶ 13.

With regard to July 21, 1990, however, the Sign-In Log indicates LeBaron was

---

[10] Attached, respectively, as Exhibits B and C to LeBaron Affidavit.

present on the second floor of the Reception Building at 8:15 A.M. to conduct an

interview.  LeBaron Declaration ¶ 13.  Although LeBaron was unable to recall whether

he interviewed an inmate or an employee with a job complaint, LeBaron maintains he

would have conducted the interview in the interview room, located in the kitchen area

on the second floor which would not have required LeBaron to enter B-West Gallery.

*Id*.  LeBaron further states that had he entered B-West Gallery, such action would have

been noted in the Activity Log.  *Id*.  As such, LeBaron maintains that the log books

establish that although LeBaron was present on the second floor of the Reception

Building on July 21, 1990, nothing within the log books indicates that LeBaron ever

entered the B-West Gallery where Gaston's SHU cell was located.  *Id*. ¶ 14.  Moreover,

LeBaron states that he never observed any excrement in front of Gaston's cell on July

7, 8, 9 or 21, 1990, nor was LeBaron made aware of any such condition.  *Id*. ¶ 15.

Grant specifically states that both the Activity Log and the Sign-In Log indicate

that Grant was not present on the second floor of Attica's Reception Building at any

time on July 21, 1990 and, thus, Grant also could not have been on the B-West Gallery

on July 21, 1990.  Grant Declaration ¶ 10.  Grant further explains that both log books

show Grant was present on the Second Floor for a Tier III disciplinary hearing on the

morning of July 7, 1990, but that such hearing would have taken place in the hearing

room attached to the kitchen on the second floor and that based on the hearing room's

location, Grant would not have gone onto any gallery either before, during or after the

disciplinary hearing and if Grant had entered any gallery, standard operating

procedures would have required that such activity be noted in the Activity Log.  Grant

Declaration ¶ 11.  Grant maintains that on July 8, 1990, he was present on the second

floor at 2:10 P.M. for a Tier III disciplinary hearing regarding an inmate named "Rivera," and, as on July 7, 1990, Grant's presence on the second floor of the Reception Building for the Tier III hearing does not mean that Grant was also present in the B-West Gallery on that date, and that there would have been an entry in the Activity Log documenting any entry by Grant onto the B-West Gallery. *Id.* ¶ 12. Grant explains that a notation "Tier III RDS" entered in the SHU Log indicates Grant entered the Second Floor of the Reception Building on July 8, 1990, at which time Grant would have spoken with the first officer to determine if anything unusual had happened during the course of the shift and to review the Activity Log. *Id.* ¶ 13. According to Grant, any inmate feces throwing incident on that date would have been noted in the Activity Log and absent such notation or report from the first officer, Grant would have been unaware of such an occurrence. *Id.* Grant states that the Activity Log contains no record regarding any inmate throwing feces or flooding his toilet on either July 7 or 8, 1990, and that the Activity Log further indicates a gallery clean-up occurred at 9:08 P.M. on July 7, 1990 and the second floor of the Reception Building was cleaned and mopped at 10:40 A.M. on July 8, 1990, demonstrating there was no excrement in front of Gaston's cell on either of those dates. *Id.* ¶ 14. Grant further explains that according to the notation "RDS Escort" entered into the SHU Log on July 9, 1990, Grant, as a Supervisor, entered the second floor, at which time Grant would have spoken with the first officer to ascertain whether there had been any unusual activity during the shift and the review the Activity Log. *Id.* ¶ 15. Grant maintains that the only entry in the Activity Log that would have caught his attention indicates that on July 9, 1990 at 3:220 P.M., Correction Officer Bartkowiak was hit with an unknown liquid thrown by an inmate named Moore who was

housed in B-West cell 7, located at the opposite end of the B-West Gallery from Plaintiff's cell. *Id*. ¶¶ 15-16.  Grant further states that according to standard procedures, following the incident, the unknown liquid would have been cleaned up as soon as it was safe to enter the area, but that, in any event, Grant did not return to B-West Gallery that day and, thus, would not have had any knowledge as to whether the liquid was immediately cleaned up. *Id*. ¶ 16.

Furthermore, both Grant and LeBaron point to Gaston's admission during his deposition that he never had any conversation with either Grant or LeBaron concerning any unsanitary conditions outside his cell, nor did Gaston ever file an inmate grievance with regard to the alleged conditions.  Grant Declaration ¶ 9 (referencing Plaintiff's Deposition T. at 37, 82-83); LeBaron Declaration ¶ 9 (same).

Gaston, in opposition to summary judgment, does not challenge the accuracy of the copies of the portions of the log books pertaining to July 7, 8, 9 and 21, 1990, or Defendants' explanations as to why the log books establish that neither Grant nor LeBaron were personally involved in any conduct pertaining to the presence of unsanitary conditions outside Gaston's SHU cell on those dates.  Nor does Gaston submit anything to establish an issue of fact as to whether Grant or LeBaron had any knowledge of unsanitary conditions as Gaston alleges.  Rather, Gaston changes the dates that he maintains the unsanitary conditions were present outside his SHU cell from July 7, 8 and 9, 1990 to "[d]uring the time surrounding the holiday of July 4, 1990, following an argument between Christopher Jenkins and another inmate."  Gaston Affidavit ¶ 23.  Gaston further maintains that "[t]he feces, excrement, sewage water and urine outside my cell in July 1990 would have been obvious to anyone stationed in or

24

walking on the second floor B-West Gallery, including the defendants who were present in the B-West Gallery of the SHU during this time." Gaston Affidavit, ¶ 26.

Defendants protest Gaston's late attempt to change the dates that he maintains the unsanitary conditions were present outside his SHU cell, characterizing such change as a belated attempt to amend the pleadings without first seeking leave of the court. Defendants' Reply at 5-6. Defendants further maintain that Gaston, in response to Defendants' discovery demands served in this action, has failed to produce a "coded" diary of daily events that Gaston maintained on a yellow legal pad, which included information pertaining to the alleged unsanitary conditions outside his SHU cell. Defendants' Reply at 4 (citing Plaintiff's Deposition T. at 17-32).   Nevertheless, Defendants submitted copies of the log books pertaining to the dates of July 3, 4, 5 and 6, 1990[11] to establish there is no basis on which to find either Grant or LeBaron was personally involved in any incident in which unsanitary conditions existed outside Gaston's SHU cell.

Specifically, Grant maintains that no entries within either of the log books indicates Grant was in SHU on July 3, 4, 5 or 6, 1990. Grant Reply Declaration ¶ 2. As such, Grant asserts he could not have been personally involved in any condition of which Gaston complains occurred on any of those dates.  *Id*.

LeBaron states that the log books demonstrate that no unsanitary conditions existed in front of or near Gaston's SHU cell during the period July 3 through July 6, 1990. LeBaron Reply Declaration ¶ 2. Rather, although the Sign-In Log indicates that

---

[11] Copies of the relevant portions of the Sign-In Log and Activity Log, respectively, are attached as Exhibits A and B to the LeBaron Reply Declaration.

LeBaron was present on the SHU floor on July 3, 1990 at 7:58 A.M., the notation "tier III Rounds" accompanying that entry indicates that LeBaron was present only to conduct a Tier III disciplinary hearing, rather than to conduct gallery rounds.  *Id*. ¶ 3.  LeBaron further states that even if he had conducted gallery rounds in SHU on July 3, 1990, no entry within the Activity Log indicates any unusual activity, indicating that the B-West Gallery was maintained in a sanitary condition and, as such, LeBaron could not have observed an unsanitary condition near Gaston's cell.  *Id.*  Moreover, July 3, 1990 entries in the log books establish that daily clean-up of the B-West Gallery occurred at 10:00 A.M. and at 9:27 P.M., and no entry in either log indicates that any unsanitary events took place that day in the B-West Gallery, including inmates throwing feces or the flooding of cells using toilets or sinks, despite facility policy requiring any such occurrence be noted in the Activity Log.  *Id*. ¶ 4.

Similarly, a Sign-In Log entry indicates that LeBaron was present on the second floor of SHU on July 4, 1990 at 8:16 A.M. for a "tier III hearing" and "rounds" and the Activity Log for that date reflects that at that time, LeBaron reviewed the Activity Log, but did not perform a gallery round.  LeBaron Reply Declaration ¶ 5.  Although Activity Log entries for July 4, 1990 indicate that a feces throwing incident occurred at 9:40 A.M. in the B-East Gallery, such incident could not have created an unsanitary condition near Gaston's SHU cell located in the B-West Gallery which is separated from the B-East Gallery by a concrete wall and, in any event, another Activity Log entry reflects the feces in the B-East Gallery was cleaned up at 10:04 A.M.  *Id*. ¶ 6.  LeBaron, at 10:20 A.M., escorted Attica Superintendent Kelly and First Deputy Superintendent Brunell on rounds of the B-West, B-East and B-South galleries, but LeBaron did not recall seeing

any feces, urine or sewage water in the galleries, which is consistent with the Activity

Log entries indicating that feces thrown at 9:40 A.M. in the B-East Gallery had been

cleaned up at 10:04 A.M.  *Id*. ¶ 6.  Another Activity Log entry states that Gaston's B-West

Gallery was again cleaned at 8:53 P.M.  *Id*.  The Activity Log further reflects that at 9:50

P.M. on July 4, 1990, the water to the cell of an inmate housed in B-East Gallery was

shut off, indicating that the inmate had flooded or was attempting to flood his cell by

clogging the sink or toilet.  *Id*. ¶ 7.  LeBaron explains that because Gaston's cell was

located in B-West Gallery, which is separated by a concrete wall from B-East Gallery,

no waste water or feces associated with the flooding or attempted flooding of a cell in

B-East Gallery would have reached Gaston's cell.  *Id*.  Moreover, another Activity Log

entry shows that the next morning, July 5, 1990, there was a clean-up of B-East Gallery

at 9:32 A.M., and of B-West Gallery at 9:47 A.M.  *Id*.

        Entries in both log books show LeBaron was present on the second floor of SHU

on July 5, 1990 at 10:55 A.M., when LeBaron reviewed the Activity Log and, based on the

entries indicating the clean-up of B-East and B-West Galleries earlier that morning,

would have no reason to believe any unsanitary conditions presently existed on the

floor near Gaston's cell.  LeBaron Reply Declaration ¶ 8.  A later Activity Log entry

indicates a feces throwing incident occurred on B-East Gallery at 3:13 P.M., but that both

B-East and B-West Galleries were cleaned a second time at 8:56 P.M.  *Id*.

        As for July 6, 1990, the Activity Log reflects that LeBaron was present in the

SHU and reviewed the Activity Log at 2:13 P.M., and that there had been no unusual or

unsanitary conditions on B-West Gallery at that time.  LeBaron Reply Declaration ¶ 10.

Furthermore, Activity Log entries show that from 4:10 P.M. until 6:52 P.M., each inmate on

B-East and B-West Galleries was furnished with cleaning supplies to clean his individual cell in accordance with facility policy, that the B-East and B-West Galleries' vents were vacuumed at 8:05 P.M. to remove dust from the ducts, and that the daily gallery cleanup occurred on B-West Gallery at 9:11 P.M. *Id*.

Gaston has submitted no affidavit or other sworn evidence challenging Defendant's statements, which are supported both by factual allegations and copies of the relevant log books, as required under Rule 56(e), and which address a period of time beginning on July 3, 1990 and continuing through July 9, 1990, as well July 21, 1990.  Rather, Gaston, in opposing summary judgment, maintains that because the Activity Log and Sign-In Logs indicate Grant and LeBaron were present in SHU during the time Gaston maintains the unsanitary conditions existed in the area in front of Gaston's SHU cell, it was impossible for Grant and LeBaron not to have noticed the conditions.  Plaintiff's Memorandum at 22-23.  However, Gaston's argument ignores the fact that nothing within the Activity Log supports his assertion that there was sewage, feces and urine in the area in front of Gaston's SHU cell, or even nearby, on any of the days in question, and Gaston's bald, conclusory statement to the contrary is insufficient to defeat summary judgment.  *Goenaga, supra*, at 18 (once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor).

Accordingly, Gaston has failed to meet his burden in opposing summary judgment based on lack of Defendants' personal involvement in the alleged Eighth

Amendment violations, based on the alleged unsanitary conditions, and summary judgment is GRANTED as to this aspect of Defendants' motion.

### C.     Cell Temperature

Finally, the record fails to establish the existence of a genuine issue of material fact regarding Gaston's assertion that several windows on the B-West Gallery, where Gaston was housed, remained broken for the entire 1990-1991 winter season, when the outside temperature was "freezing and sub-zero," that the radiators were set on "low" during the day such that the heat in the B-West Gallery was not adequate compelling Gaston and other inmates to don all issued clothing, including coats and sneakers, while in their cells or in bed.  Amended Complaint ¶¶ 69-71.  In support of summary judgment, Defendants Grant and LeBaron state that when they occasionally made rounds on the B-West Gallery during the winter of 1990-1991, Gaston never complained that the temperature was too low, or of broken windows, and point to Gaston's deposition testimony where Gaston admitted he never made any such complaints.  Grant Declaration ¶¶ 3-4 (citing Plaintiff's Deposition T. at 82); LeBaron Declaration ¶¶ 3-4 (same).  Grant and LeBaron further maintain that they were unaware until after Gaston commenced the instant action that Gaston had filed grievances pertaining to broken windows in B-West Gallery, they were not involved in any such grievances, were never aware of any complaints by Gaston about broken windows and never observed the broken windows and, as such, it was impossible for either Grant or LeBaron to have been intentionally indifferent to the situation.  Grant Declaration ¶ 5; LeBaron Declaration ¶ 5.

In support of summary judgment, Attica Maintenance Supervisor III and Acting Plant Superintendent Marco Hume states that in his position he is "fully familiar with the practices and procedures utilized by the Maintenance Department at Attica, which is responsible for maintaining the physical aspects of the facility."  Hume Declaration ¶ 1. Hume states that Gaston filed a grievance on December 13, 1990 regarding two broken windows on the B-West Gallery, located seven feet across the hall from Gaston's SHU cell, and that the Maintenance Department is responsible for repairing broken windows. *Id*. ¶¶ 3-4.  Although the two windows measure seven feet high by four feet wide, the windows are divided into 20 panes measuring 17 inches by 11 ⅝ inches.  *Id*. ¶ 3. Hume explains that when a repair is necessary within the Attica facility, a Maintenance Work Request is submitted to the Maintenance Department, and that according to the maintenance records for the years 1990 and 1991, a Maintenance Work Request was submitted to the Maintenance Department on December 5, 1990 ("December 5, 1990 Work Order")[12] regarding the broken windows in the Reception Building's South Gallery across from SHU cell 10, and the West Gallery across from SHU cell 24, *Id*. ¶¶ 5-6; December 5, 1990 Work Order, near Gaston's SHU cell 23.  The December 5, 1990 Work Order indicates that the broken windows were initially repaired on December 21, 1990, by Ken Willey ("Willey").[13]  Hume Declaration ¶ 7; December 5, 1990 Work Order. Entries in both the Activity Log and Sign-In Log show Willey was present in SHU on

---

[12] A copy of the December 5, 1990 Work Order is attached as Exhibit D to the Hume Declaration.

[13] Hume observes that although Willey indicated on the December 5, 1990 Work Order that he repaired the broken windows on December 20, 1990, Willey apparently wrote down the incorrect date as the corresponding Activity Log and Sign-In Logs indicate Willey was on the SHU to repair windows on December 21, 1990.  Hume Declaration ¶¶ 7-8.

December 21, 1990 at 9:21 A.M.[14]   Hume explains that because the structure of the

windows on the SHU required that they be replaced from outside the building, and as

ladders were needed to reach second and third story windows, ice and snow on the

ground prevented the replacement of broken windows during the winter months;

instead, broken windows were initially repaired from inside by placing cardboard over

the broken window and sealing the window with duct tape.  Hume Declaration ¶ 9.  The

December 5, 1990 Work Order further indicates that the final repair, *i.e.*, replacement of

the broken windows, was completed on the B-West Gallery on April 17, 1991 by Rick

Kranz.  Hume Declaration ¶ 10; December 5, 1990 Work Order.[15]

Hume also explains that the December 5, 1990 Work Order, and the relevant

entries in the Activity Log and Sign-In Log are consistent with the grievance package

("the Grievance Package") generated in response to the grievance Gaston filed

regarding the broken windows.[16]  Specifically, Gaston filed the grievance on December

19, 1990 and, on December 20, 1990, the Inmate Grievance Resolution Committee

("IGRC") made a recommendation to Attica's Superintendent that "the broken windows

be fixed before the freezing weather sets in, which is getting close."  Hume Declaration

¶ 14; Grievance Package at 3.  The Superintendent's response to the grievance also

---

[14] Copies of the relevant portions of the Sign-In Log and Activity Log are attached, respectively, as Exhibits E and F to the Hume Declaration.

[15] Hume observes that although Kranz indicated on the December 5, 1990 Work Order that the broken window was replaced on April 18, 1991, Kranz apparently recorded the incorrect date as the corresponding Activity Log and Sign-In Log entries indicate Kranz was on the SHU to measure the broken windows on April 17, 1990, and returned later that day with Mr. Kirsch to replace the windows.  Hume Declaration ¶¶ 10-12.

[16] A copy of the Grievance Package is attached as Exhibit A to the Hume Declaration.

establishes that the windows were initially repaired with cardboard on December 21, 1990, and would be replaced in the spring of 1991.  Hume Declaration ¶ 15; Grievance Package at 4.

In opposing summary judgment, Gaston argues that the record, including the one day discrepancies as to the date the initial window repairs were made, as well as the date the broken windows were replaced, demonstrate the existence of issues of fact regarding the windows.  Plaintiff's Memorandum at 11.  Gaston further maintains that although he complained of two broken windows on the B-West Gallery, the December 5, 1990 Work Order refers to only one broken window on the B-West Gallery, and that issues of fact remain as to whether any windows were initially repaired with cardboard given that Gaston complained on February 1, 1991 that there was no cardboard on any of the broken windows, and that even if such repair had been made, then further issues of fact remain as cardboard would not effectively seal a window from the rain and snow that commonly occur during a winter in upstate New York.  Plaintiff's Memorandum at 8-11 & n. 3.

Gaston's arguments in opposition to summary judgment, however, ignore the more fundamental issue, *i.e.*, that nothing in the record establishes that either Defendant Grant or LeBaron knew of the broken windows and either interfered with or delayed their repair, were in any way involved with resolving the inmate grievance Gaston submitted with respect to the window or, even more basic, that Grant or LeBaron, in rendering the Tier III disciplinary hearing dispositions by which Gaston was confined to Attica's SHU during the winter of 1990-1991, knew and intended that two windows in the B-West Gallery, where Gaston's SHU cell was located, would be broken

and remain broken so as to expose Gaston to inhumane conditions while in SHU.  On this record, the court finds that Gaston has failed to oppose summary judgment with any affidavit or any other sworn evidence sufficient to defeat summary judgment as to the claimed broken windows.  *St. Pierre*, *supra*, at 404.

As to Gaston's complaints that the B-West Gallery was inadequately heated during the winter of 1990-1991, Defendant Grant states that the radiators in SHU cannot be turned to a "low" setting as the radiators are always on "full blast whenever they are activated, which is usually mid-October of each year."  Grant Declaration ¶ 3. Defendants Grant and LeBaron both state that Gaston never complained to them that the temperature in his cell was too cold during the relevant period of time.  Grant Declaration ¶¶ 3-4; LeBaron Declaration ¶¶ 4-5.  As such, both Grant and LeBaron maintain they cannot be liable for failing to take any action to remedy cold conditions in Gaston's SHU cell.  *Id*.

Attica Maintenance Supervisor III and Acting Plant Superintendent Hume also addresses Gaston's complaints about inadequate heat in his SHU cell, explaining that the Maintenance Department is responsible for maintaining the radiators in the Attica facility.  Hume Declaration ¶ 4.  According to Hume, Gaston filed a grievance dated January 24, 1991 ("January 24, 1991 Declaration"),[17] requesting the heat in the B-West Gallery be turned up, alleging that

> [t]he heaters on this company are so low as to be completely ineffective for providing enough heat.  It has been extremely cold during the day and only slightly comfortable at night.  This heat must be on high enough in the day so

---

[17] A copy of Gaston's January 24, 1991 Grievance is attached as Exhibit B to the Hume Declaration.

that the steel and concrete can absorb its warmth instead of the cold of the winter.  It is freezing cold now, and the radiators are on very, very low levels of temperature.

January 24, 1991 Grievance at 3.

The January 24, 1991 Grievance papers further indicate that the grievance was investigated and denied for lack of any evidence substantiating Gaston's inadequate heat claim.  *Id.*

Hume explains that the mechanics of the radiator heating system at Attica rendered Gaston's request that the radiators in SHU be set higher during the day impossible as the same amount of heat is radiated from the heaters whenever the radiators are activated.  Hume Declaration ¶ 18.  According to Hume,

> [t]he only way that the radiators in the B-West Gallery could have been on a 'low' setting during the day, as the Plaintiff alleges, is if the heating plant reduced the level of steam output from the hearing plant that is fed to the radiators.  However, such a scenario could not have occurred because there is only one steam output source for the entire facility, and the level of steam output cannot be controlled at the heating plant differently for individual buildings.  Therefore, the entire facility would have been affected by any such low steam pressure, and the entire facility would have had below normal temperatures.

Hume Declaration ¶ 19.

Hume continues that such a "facility-wide heating problem" would have been reported to the heating plant, rather than to the Maintenance Department, and that he worked at Attica during the winter of 1990-1991 and did not recall any such facility-wide occurrence.  *Id.*  If an individual radiator failed to work properly, the initial complaint would have been made to the heating plant, which would have contacted the Maintenance Department for repair, generating a work order regarding the situation, but that no such work order was generated during the winter of 1990-1991 for the SHU's B-

West Gallery.  *Id*.  Furthermore, Hume states that there is no temperature control in the Reception Building, where Attica's SHU is located, and, as such, DOCS employees working within that building are unable to control its temperature and, thus have no control over the building in which they work and the inmates live.  *Id*. ¶ 20.

As discussed above in connection with the alleged mice infestation, Discussion, *supra*, at 16, copies of Attica's Maintenance Work Requests for the years 1990 and 1991 are attached as Exhibit C to the Hume Declaration.  A thorough review of those requests establish that, consistent with Hume's statements, no work order pertaining to any radiator in the B-West Gallery was issued during the winter of 1990-1991. Accordingly, this aspect of Defendant's motion for summary judgment is properly supported.

In opposing summary judgment, Gaston does not challenge Hume's description of how the temperature is controlled in the SHU, nor does Gaston challenge Hume's assertion that no work order was generated during the 1990-1991 winter season pertaining to any malfunctioning radiator in the B-West Gallery.  Rather, Gaston's argument in opposition to summary judgment is limited to his unsupported assertion that an issue of fact remains as what the temperature in his SHU cell was while he was confined there.  Plaintiff's Memorandum at 4-8; Plaintiff's Affidavit ¶¶ 16-18.

However, even assuming, *arguendo*, that the temperature in Gaston's SHU cell was so low for so long as to constitute an Eighth Amendment violation, Gaston still has failed to submit any affidavit or other sworn testimony establishing that either Defendant Grant or LeBaron was aware of unconstitutionally cold temperatures and, further, interfered with attempts to remedy the situation.  Nor does Gaston submit anything

demonstrating that either Grant or LeBaron was involved in investigating or otherwise

resolving the January 24, 1991 grievance Gaston filed complaining about the cold.

Moreover, nothing in the record suggests that Grant or LeBaron, in rendering the Tier III

disciplinary hearing dispositions by which Gaston was confined to Attica's SHU during

the winter of 1990-1991, knew and intended that the heat would be set too low on the

B-West Gallery, where Gaston's SHU cell was located, or would be broken and remain

broken.  On this record, the court finds that Gaston has failed to oppose summary

judgment with any affidavit or any other sworn evidence sufficient to defeat summary

judgment as to the claimed low temperature. *St. Pierre*, *supra*, at 404


## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No.

143) is GRANTED.  The Clerk of the Court is directed to close the file.

**Any appeal to the United States Court of Appeals for the Second Circuit,**

**New York, New York, must be filed within thirty (30) days of the date of judgment**

**in this action.  *See* Fed.R.App. 4(a)(1).  Further, the court certifies under Rule**

**24(a)(3)(A) of the Federal Rules of Appellate Practice that any appeal by Plaintiff**

**of the foregoing Decision and Order would not be in good faith as the paucity of**

**the record fails to establish a triable issue of fact for any Eighth Amendment**

**claim.  As such, requests to proceed on appeal as a poor person must be filed**

**with the United States Court of Appeals for the Second Circuit in accordance with**

**the requirements of Rule 24(a)(5) of the Federal Rules of Appellate Procedure.**

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     May 18 , 2005
              Buffalo, New York